In re William R. KELLEY and
Carol Jo Kelley, Debtors.

The EMPLOYERS WORKERS' COM-
PENSATION ASSOCIATION,
Plaintiff-Appellant,

v.

William R. KELLEY, Defendant-
Appellee.

BAP No. NO–97–037.
Bankruptcy No. 95–1209.
Adversary No. 95–00321.

United States Bankruptcy Appellate Panel
of the Tenth Circuit.

Dec. 23, 1997.

Richard A. Shallcross of Brewster, Shallcross & DeAngelis, Tulsa, OK, for Plaintiff-Appellant.

Bruce G. Straub, Tulsa, OK, for Defendant–Appellee.

Before PUSATERI, BOULDEN, and ROBINSON, Bankruptcy Judges.

## OPINION

PUSATERI, Bankruptcy Judge.

This is an appeal from a judgment, entered after a bench trial, that determined a debt to be dischargeable under 11 U.S.C.A. § 523(a)(4) or (6). The creditor contends the debt arose from embezzlement or from defalcation while acting in a fiduciary capacity, covered by (a)(4), or from conversion, covered by (a)(6).

## I. Background

The Employers Workers' Compensation Association ("TEWCA") is a group formed under Okla. Stat. Ann. tit. 85, § 149.1 (West 1992), through which employers could pool together liabilities in order to qualify as a group self-insurer under the Oklahoma Workers' Compensation Act. It was a licensed self-insurance group from 1986 until the end of 1994. Debtor William R. Kelley ("Kelley") was one of several insurance agents who sold TEWCA memberships to employers.

Kelley's contract with TEWCA[1] is very short, and for purposes of this appeal, its only significant provision declares that Kelley "shall be primarily liable to TEWCA for the full amount of premium less commission ... on every member contract placed by" him. Kelley's debt for the premiums would be due

and payable "from the date liability [was] assumed" by TEWCA, and he was to remit the premiums to TEWCA by the 15th of the "month succeeding billing month" for his customers' contracts with TEWCA. Although the contract does not expressly say the arrangement should operate this way, the members Kelley brought to TEWCA would send him their monthly workers' compensation insurance premiums, payable to him, and he would deposit their checks into his single, general business bank account. Sometime later, from that account, he would pay TEWCA the amount it was owed. As the bankruptcy court correctly pointed out, "[t]he Agreement does not require Kelley to establish a trust account or to segregate any funds he collects."

In October, November, and December 1992, Kelley collected insurance premiums from TEWCA members but did not pay when due the amounts he owed TEWCA for those members' insurance coverage. He later paid about $6,000 towards those amounts, leaving about $59,000 still due. After December 1992, TEWCA had its third-party administrator take over the task of collecting from the members Kelley had brought to the association. Because his contract made him primarily liable for them, Kelley owed TEWCA an additional $33,000 or so for premiums that members failed to pay to him or TEWCA. Before Kelley filed for bankruptcy, TEWCA credited against the $59,000 the commissions Kelley would have been entitled to receive from premiums its administrator collected in 1993 and 1994. After he filed, however, TEWCA instead tried to credit them against the $33,000.

TEWCA brought an adversary proceeding to contest the dischargeability of the $59,000 debt. It claimed that Kelley either embezzled the premiums or committed a defalcation while acting in a fiduciary capacity so the debt was covered by § 523(a)(4), or converted the premiums so the debt was covered by § 523(a)(6). The Bankruptcy Court concluded Kelley was not a fiduciary for

---

1. The contract actually indicates it is between TEWCA and "Bill Kelley & Associates." However, the parties and the bankruptcy court treated the contract as though it involved only Kelley personally, so we will not consider whether "Bill Kelley & Associates" might have been an entity distinct from Kelley himself.

TEWCA. It declared the TEWCA-Kelley contract merely created a debtor-creditor relationship between them and was a collection device for TEWCA. The Court rejected TEWCA's reliance on Okla. Stat. Ann. tit. 36, § 1445(A) (West 1992), of the Oklahoma Third-Party Administrator Act to establish the necessary fiduciary relationship, on the ground that § 1441.1 exempts from that act administrators of group self-insurance associations created pursuant to Okla. Stat. Ann. tit. 85, § 149.2. It rejected TEWCA's reliance on Okla. Stat. Ann. tit. 36, § 1465(E), of the Oklahoma Life, Accident and Health Insurance Broker Act to establish the relationship, on the grounds that: (1) workers' compensation insurance is not life or accident and health insurance; (2) TEWCA had not argued Kelley was a "life or accident and health insurance broker" as defined by Okla. Stat. Ann. tit. 36, § 1462; and (3) even if he were such a broker, he did not receive the premiums at issue in that capacity. The Court rejected TEWCA's embezzlement claim and its conversion claim because the premiums Kelley collected became his money, and his obligation to pay TEWCA its share of premiums he collected for insurance it provided arose from an ordinary debtor-creditor relationship.

TEWCA has filed a motion to supplement the record on appeal, which Kelley does not oppose. The motion is granted.

## II. Standard of Review

In reviewing an order of a bankruptcy court, an appellate court "reviews the factual determinations of the bankruptcy court under the clearly erroneous standard, and reviews the bankruptcy court's construction of [a statute] de novo." *Taylor v. I.R.S.,* 69 F.3d 411, 415 (10th Cir.1995) (citations omitted).

A finding of fact is clearly erroneous only if the court has "the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). "It is the responsibility of an appellate court to accept the ultimate factual determination of the fact-finder unless that determination either (1) is completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supportive evidentiary data." *Krasnov v. Dinan,* 465 F.2d 1298, 1302 (3d Cir.1972).

*Gillman v. Scientific Research Prods. (In re Mama D'Angelo, Inc.),* 55 F.3d 552, 555 (10th Cir.1995).

## III. Discussion

### A. Embezzlement or Conversion

TEWCA's arguments on the embezzlement and conversion claims begin with the unstated assumption that the workers' compensation insurance premiums Kelley's customers paid to him immediately belonged to TEWCA, but, other than its claims about the premiums constituting trust funds, the association points to no evidence supporting its ownership claim. It does not attack the bankruptcy court's findings that the TEWCA-Kelley contract did not require Kelley to establish a trust account for the premiums or to segregate them from any other money he might receive. As indicated above, rather than declaring that the premiums Kelley collected immediately became TEWCA's property, the contract made Kelley primarily liable to TEWCA for the amount of the premiums minus his commission. Unless we accept TEWCA's claim that applicable Oklahoma law provided that Kelley held the premiums in trust, there is no basis for determining that TEWCA owned the premiums at any time before Kelley paid them over to it. Without that underlying basis, Kelley could not have embezzled or converted TEWCA's property. Instead, Kelley would simply be an ordinary debtor with an ordinary debt he was unable to pay. We must therefore turn to TEWCA's arguments that Kelley acted in a fiduciary capacity.

### B. Fiduciary Capacity

Section 523(a)(4) of the Bankruptcy Code excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity." The Tenth Circuit recently explained the meaning of "fiduciary capacity" in this provision.

The existence of a fiduciary relationship under § 523(a)(4) is determined under federal law. However, state law is relevant to this inquiry. Under this circuit's federal bankruptcy case law, to find that a fiduciary relationship existed under § 523(a)(4), the court must find that the money or property on which the debt at issue was based was entrusted to the debtor. Thus, an express or technical trust must be present for a fiduciary relationship to exist under § 523(a)(4). Neither a general fiduciary duty of confidence, trust, loyalty, and good faith, nor an inequality between the parties' knowledge or bargaining power, is sufficient to establish a fiduciary relationship for purposes of dischargeability. "Further, the fiduciary relationship must be shown to exist prior to the creation of the debt in controversy." [*Allen v. Romero (In re Romero)*], 535 F.2d [618,] 621 [ (10th Cir.1976) ].

*Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1371–72 (10th Cir.1996) (additional citations omitted). We are, of course, obliged to apply this narrow view of the fiduciaries who are covered by § 523(a)(4).

■ TEWCA offers several potential sources in Oklahoma law that it contends made Kelley a fiduciary for the association. It first mentions Oklahoma common law, citing two cases that address that source, but makes little effort to explain how the cases would apply here. See *Devery Implement Co. v. J.I. Case Co.*, 944 F.2d 724, 729–30 (10th Cir.1991); *San Saba Pecan, Inc., v. Failing (In re Failing)*, 124 B.R. 340, 344 (W.D.Okla.1989). In *Devery Implement*, a diversity case, the Tenth Circuit reviewed Oklahoma law about fiduciary relationships, saying:

> Oklahoma courts have not given a precise definition of a fiduciary relationship, see *MidAmerica Federal Sav. & Loan Ass'n v. Shearson/American Exp., Inc.*, 886 F.2d 1249, 1257 (10th Cir.1989), but have held that the relationship arises whenever
>
>> there is confidence reposed on one side and resulting domination and influence on the other.... [The] relationship springs from an attitude of trust and

confidence and is based on some form of agreement, either expressed or implied, from which it can be said the minds have been met to create a mutual obligation.

> *Lowrance v. Patton*, 710 P.2d 108, 112 (Okla.1985) (citations omitted). See also *MidAmerica Federal Sav. & Loan Ass'n*, 886 F.2d at 1257 (quoting *Lowrance* ). Another Oklahoma court described the relationship as occurring " 'when the circumstances make it certain the parties do not deal on equal terms, but on the one side there is an overmastering influence, or, on the other, weakness, dependence, or trust, justifiably reposed; in both an unfair advantage is possible.' " *In re Estate of Beal*, 769 P.2d 150, 155 (Okla.1989) (quoting *In re Null's Estate*, 302 Pa. 64, 153 A. 137 (1930)).
>
> ... [Oklahoma] courts have held that fiduciary relationships are not limited to any specific legal relationship. [Citations omitted.] Instead, fiduciary duties may arise anytime the facts and circumstances surrounding a relationship "would allow a reasonably prudent person to repose confidence in [another person]." *In re Estate of Beal*, 769 P.2d at 155....
>
> Certainly, most contracts involve a degree of the factors indicative of reposed trust and confidence. For example, all contracts ultimately involve mutual intent, and many involve disparate bargaining power; however, only those instances which involve a veritable "substitution of the will of the defendant for that of the plaintiff in material matters involved in the transaction" will give rise to fiduciary duties. *Sellers v. Sellers*, 428 P.2d 230, 236 (Okla.1967) (citing *Derdyn v. Low*, 94 Okla. 41, 220 P. 945 (1923)). This ensures that common commercial dealings are not subject to heightened fiduciary responsibilities.

944 F.2d at 729–30. TEWCA does not explain why the Bankruptcy Court should have found that Kelley's will was essentially substituted for TEWCA's will in their transactions, nor do we see evidence to that effect in the record. Indeed, it is hard to imagine that a party exercising overmastering influence over another would agree, as Kelley did,

to be primarily liable to the other for premiums due from his customers whether or not they paid him. Furthermore, *Devery Implement* was not even a bankruptcy case, much less one construing the "fiduciary capacity" requirement of § 523(a)(4). We think *Fowler Brothers* makes clear that many relationships satisfying the requirements described in *Devery Implement* would not satisfy § 523(a)(4). In the *San Saba Pecan* case, the bankruptcy court had considered conflicting evidence and found that the parties had made an express trust agreement for holding a $30,000 deposit, a finding the district court ruled was not clearly erroneous. 124 B.R. at 344. It provides no support for TEWCA's claim that the Bankruptcy Court was required to find a common law trust existed in this case.

▇ TEWCA also cites two Oklahoma statutes that it claims imposed the necessary fiduciary duty on Kelley. *See* Okla. Stat. Ann. tit. 36, §§ 1445 & 1465(E) (West 1990). Trusts imposed by state statutes are often, but by no means always, found to satisfy § 523(a)(4). *Compare, e.g., Quaif v. Johnson,* 4 F.3d 950 (11th Cir.1993) (per curiam decision adopting district court decision finding statute satisfied § 523(a)(4)) *with In re Marchiando,* 13 F.3d 1111 (7th Cir.), *cert. denied,* 512 U.S. 1205, 114 S.Ct. 2675, 129 L.Ed.2d 810 (1994) (statute imposing trust on lottery ticket sales proceeds did not satisfy § 523(a)(4)). One case, with which we agree, identified three requirements for a state statute to satisfy § 523(a)(4): "(1) that the trust res must be defined by the statute; (2) that the statute must spell out the fiduciary duty; and (3) that the statute must impose a trust on funds prior to the act creating the debt." *Medved v. Novak (In re Novak),* 97 B.R. 47, 59 (Bankr.D.Kan.1987).

▇ Although the Bankruptcy Court concluded neither statute applied to Kelley, we have reviewed them and determine that one of them does not impose the fiduciary relationship necessary to bring his debt to TEWCA under § 523(a)(4). That one is Okla. Stat. Ann., title 36, § 1465(E), a part of the Oklahoma Life, Accident and Health Insurance Broker Act ("OLAHIBA"). It reads:

E. Every life or accident and health insurance broker · acting as such in this state shall be responsible in a fiduciary capacity for all funds received or collected as a life or accident and health insurance broker and shall not mingle any such funds, without the express consent of his principal, with the broker's own funds or with funds held by the life or accident and health insurance broker in any other capacity. Nothing in this section shall be construed to require any broker to maintain a separate bank deposit if the funds of each principal are clearly ascertainable from the books of account and records of the life or accident and health insurance broker.

This provision fails the second part of the *Novak* test for state statutes. Simply restricting commingling of funds does not sufficiently define the fiduciary duty imposed here to bring the statute within § 523(a)(4). Furthermore, even if we thought this statute imposed the necessary fiduciary capacity, we would affirm the Bankruptcy Court's ruling about this statute because TEWCA does not argue and has not pointed us to anything in the record which shows that the Bankruptcy Court was wrong when it said TEWCA had not argued Kelley was a life or accident and health insurance broker covered by the OLAHIBA.

▇ We are not able, however, to declare that the other statute does not impose the requisite fiduciary duty. This provision is part of the Oklahoma Third-Party Administrator Act ("TPAA"), Okla. Stat. Ann. tit. 36, §§ 1441 to 1453, and reads:

A. All insurance charges or premiums collected by an administrator for an insurer or trust and all return premiums received from the insurer or trust shall be held by the administrator in a fiduciary capacity. These funds shall be immediately remitted to the person entitled to the funds or shall be deposited promptly in a fiduciary bank account established and maintained by the administrator.

B. If charges or premiums deposited in a fiduciary account have been collected for more than one insurer or trust, the administrator shall keep records showing the

deposits to and withdrawals from the account for each insurer or trust. The administrator, upon request of an insurer or trust, shall furnish copies of the records pertaining to deposits to and withdrawals from the account for that insurer or trust.

C. The administrator shall not pay any claim by withdrawals from a fiduciary account unless provisions for said withdrawals are included in the written agreement between the insurer or trust and the administrator. The written agreement shall authorize withdrawals by the administrator from the fiduciary account only for:

1. remittance to an insurer or trust entitled to a remittance; or

2. deposit in an account maintained in the name of an insurer or trust; or

3. transfer to and deposit in an account established for payment of claims, as provided for by subsection D of this section; or

4. payment to a group policyholder for remittance to the insurer or trust entitled to such remittance; or

5. payment of commission, fees, or charges to the administrator; or

6. remittance of return premiums to the person entitled to such return premiums.

D. All claims paid by the administrator from funds collected on behalf of the insurer or trust shall be paid on drafts or checks authorized by the insurer or trust.

Okla. Stat. Ann. tit. 36, § 1445. This provision identifies as a trust res all the insurance charges or premiums that an administrator collects for an insurer, and spells out the administrator's fiduciary duty by specifying the few permissible uses of the premiums he collects. While a trustee is ordinarily not permitted to mingle property held in trust with property not subject to the same trust, we believe a trustee can be permitted to mingle the property of one trust with the property of another trust when permission to do so is given at the creation of each trust, as this statute does, and the trustee keeps an accurate record of the contributions of each trust, as the statute requires. *See Restatement (Second) of Trusts* § 179 (1959). Finally, if § 1445 applies to Kelley and his

collections from his customers, we believe the provision imposed a trust on the collections from the moment his customers paid him, so he would have held them in the kind of fiduciary capacity that is covered by § 523(a)(4). Consequently, we cannot affirm the Bankruptcy Court's ruling if we assume the statute applied to Kelley.

We must therefore consider the Bankruptcy Court's reasoning. As mentioned earlier, the Bankruptcy Court concluded Kelley was not covered by § 1445 because § 1441.1 excludes administrators of group self-insurance associations created under Okla. Stat. Ann. tit. 85, § 149.2, from the TPAA. However, it had previously noted that TEWCA was formed under § 149.1, not § 149.2. Section 149.1 provides in pertinent part:

A. The Workers' Compensation Court shall adopt rules permitting two or more employers not otherwise subject to the provisions of Section 2b of this title to pool together liabilities under this act for the purpose of qualifying as a group self-insurer and each such employer shall be classified as a self-insurer.

This provision allows employers to form groups for obtaining all their workers' compensation insurance coverage. Section 149.2 provides:

The Workers' Compensation Court shall adopt rules permitting two or more group self-insurance associations to pool their liabilities under this act for the purpose of providing such group self-insurance associations specific and aggregate excess insurance.

Thus, groups formed under § 149.1 can join together under § 149.2 for the much more limited purpose of obtaining excess insurance. We have not found any legislative history or case law that might explain why groups formed under the one provision but not the other would be exempted from the TPAA. The more limited purpose of § 149.2 groups might be the reason. In any event, we are forced to conclude the Bankruptcy Court erred when it ruled § 1441.1 exempted Kelley from the TPAA if he otherwise qualified as a third-party administrator for TEWCA.

We have reviewed the record and find that we cannot resolve as a matter of law the factual question whether Kelley was covered by § 1445. Some evidence would indicate that he was not. His contract with TEWCA made him primarily liable for the workers' compensation insurance premiums (less commission) resulting from the member contracts he placed with TEWCA, and required him to pay those premiums to TEWCA without regard to his ability to collect from his customers. This constitutes some evidence that he did not collect premiums "for an insurer," § 1445(A), but instead for himself. The checks his customers gave him were payable to him, not to TEWCA or in trust for TEWCA. In addition, § 1442(1)(g) excludes from the TPAA a licensed life or disability agent or broker "whose activities are limited exclusively to the sale of insurance." We find nothing in the record to indicate that his activities were not so limited.

On the other hand, some evidence would indicate that Kelley may have been a third-party administrator for TEWCA under the TPAA. Since the insurance Kelley sold and tried to collect for was coverage provided by TEWCA, at least in some sense Kelley was collecting the premiums from his customers "for an insurer." When he failed to pay TEWCA for several months, TEWCA prevented Kelley from continuing to collect from his customers for its insurance and assigned to another company the task of collecting from them. The Bankruptcy Court also declared the TEWCA-Kelley contract was a collection device for TEWCA, giving at least some indication the Court may have believed Kelley was collecting the premiums for TEWCA.

We believe we should make one final point about the application of the *Novak* test to § 1445. The third part of that test requires a state statute to impose a trust on funds before the debtor commits the act creating the debt. Under the unusual TEWCA-Kelley contract, Kelley owed TEWCA a debt for each customer's monthly premium, apparently from the first day of each month for which TEWCA provided insurance coverage, and had until the middle of the next month to pay the debt. This seems to indicate the third part of the *Novak* test would not be satisfied here. However, we think that part of the test was derived from cases where no fiduciary duty was imposed on the debtor until he committed the act creating the debt, such as constructive or resulting trusts. But the true concern of the test is to be sure that the debtor owed a fiduciary duty within the meaning of § 523(a)(4) before he committed the act that may make the debt nondischargeable. That is, the duty must precede the act punished by § 523(a)(4). Here, although Kelley probably owed TEWCA a debt before he collected premiums from his customers, if § 1445 applied to his collections, it imposed a fiduciary duty on him at the moment he collected, and his subsequent use of the premiums for purposes other than paying TEWCA would constitute the acts that subjected the debt to § 523(a)(4).

## IV. Conclusion

For these reasons, we must reverse the Bankruptcy Court's ruling that Okla. Stat. Ann. tit. 36, § 1441.1, precluded the Oklahoma Third-Party Administrator Act from applying to Kelley's activities relating to TEWCA's insurance. We remand the matter for the Court to make a factual finding about the TPAA's applicability to the TEWCA-Kelley relationship and to the premiums that Kelley collected from his customers to pay for TEWCA insurance coverage. If the Court finds that Kelley or his relevant collections were not covered by § 1445 of the TPAA, its original conclusion that his debt to TEWCA is dischargeable would be correct. If, however, the Court finds that Kelley was covered by § 1445 and held his customers' premiums in trust for TEWCA, it will then need to consider whether Kelley's failure to pay the proper portion of those premiums to TEWCA constituted a defalcation or embezzlement under Bankruptcy Code § 523(a)(4), or a conversion under § 523(a)(6).

In all other respects, the Bankruptcy Court's decision is affirmed.